STATE of South Dakota, Plaintiff
and Appellant,

v.

Jim Dale ANDERSON, Defendant
and Appellee.

No. 14493.

Supreme Court of South Dakota.

Considered on Briefs Sept. 14, 1984.

Decided Dec. 12, 1984.

Jeffrey P. Hallem, Asst. Atty. Gen., Pierre, for plaintiff and appellant; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Gary G. Colbath of Banks & Johnson, Rapid City, for defendant and appellant.

MORGAN, Justice.

This court allowed the state of South Dakota to appeal a suppression order entered by the Sixth Judicial Circuit Court. The trial judge held that Highway Patrolman Steven Kenoyer (Kenoyer) did not have probable cause to stop and arrest Jim Dale Anderson (Anderson) and that all evidence derived from the stop and arrest including the breathalyzer and blood test results, should be suppressed. We reverse and remand.

The Wall, South Dakota, Police Department telephoned Kenoyer at his home in Philip, South Dakota, at approximately 8:13 a.m. on March 17, 1983. The Wall Police Chief told Kenoyer that an intoxicated driver had left a Wall gas station headed east toward Philip in a black International Scout. Kenoyer drove west out of Philip and located the Scout between Philip and Wall. He followed it for two miles back

into Philip and observed the Scout's speed vary from 45 to 55 miles per hour and saw it cross the white shoulder line once. When the Scout entered Philip it stopped at a stop sign and turned right. Kenoyer noticed that the vehicle's right taillight and right brake light failed. At this point, Kenoyer stopped the vehicle on the basis of the Wall Police Department tip and the equipment violations he observed.

The trial court concluded that in spite of the suspicion raised by the police tip, the facts and circumstances known to Kenoyer at the time of the stop did not justify the stop or the arrest. The trial court's Conclusion of Law II reads:

The stop by Trooper Kenoyer lacked probable cause in that once he investigated as a result of the Chief of Police's tip, the situation presented to him did not have numerous independent factors outside of the police tip on which to base his findings for probable cause. Once he made the stop all of the factors that he articulated and the sobriety tests which he normally relied on mitigated against probable cause except for the PBT and thus Trooper Kenoyer lacked probable cause for both the initial stop and for the subsequent arrest.

The trial court distinguished probable cause to stop from probable cause to arrest, but failed to distinguish the standards.

This court recently examined the requisite grounds for a justifiable routine traffic stop in *State v. Anderson*, 331 N.W.2d 568 (S.D.1983). The *Anderson* Court cited and quoted a Minnesota case, *Marben v. State, Dept. of Public Safety*, 294 N.W.2d 697, 699 (Minn.1980), for the proposition that:

[A] police officer may not stop a vehicle without a reasonable basis for doing so. Consistent with the principles set out in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *the officer must have a specific and articulable suspicion of a violation before the stop will be justified.*

331 N.W.2d at 570 (emphasis in original).

In *Anderson*, this court adopted the Minnesota Supreme Court's definition of the "reasonable suspicion" standard which was taken in part from *People v. Ingle*, 36 N.Y.2d 413, 369 N.Y.S.2d 67, 330 N.E.2d 39 (1975), in which the New York Court stated:

"It should be emphasized that the factual basis required to support a stop for a 'routine traffic check' is minimal .... All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity. It is enough if the stop is based upon 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion[.]' "

36 N.Y.2d at 420, 369 N.Y.S.2d at 74, 330 N.E.2d at 44 (citation omitted). The reasonable suspicion standard was thus applied to routine traffic stops in South Dakota, including stops involving suspicion of DWI. *Anderson*, 331 N.W.2d at 570. This court previously applied the reasonable suspicion standard in other factual situations. *See State v. Soft*, 329 N.W.2d 128, 129 (S.D.1983); *State v. Coe*, 286 N.W.2d 340 (S.D.1979); *State v. Boardman*, 264 N.W.2d 503 (S.D.1978).

The arresting officer in *Anderson*, an experienced police officer with training in detection of drinking drivers, observed the defendant veer into snow-packed areas of the road and weave back to the clear lane. This activity afforded a specific and articulable reason to stop the defendant's car to determine whether he was driving under the influence of an alcoholic beverage. 331 N.W.2d at 570. The reasonable suspicion standard was also applied in *Whitson v. Department of Public Safety*, 346 N.W.2d 454 (S.D.1984). The arresting officer in *Whitson* observed the defendant ignore a "right turn only" lane marker and force two other vehicles to slow down to avoid a collision. This court held that in the absence of a factual basis to support the argument that a stop was random, the argument that it was unlawful is without merit. *Id., citing Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59

L.Ed.2d 660 (1979). Circumstances giving rise to a " 'specific and articulable suspicion of a [traffic] violation'," are also sufficient to justify the investigatory stop of a vehicle. *Whitson,* 346 N.W.2d 454 at 456 (S.D.1984); *Anderson,* 331 N.W.2d at 570. Either the Police Chief's tip, even though based on hearsay, or the equipment violation on Anderson's car was sufficient to justify the stop in this case.

Kenoyer stopped the Scout in a parking lot and he and the driver both emerged from their vehicles. Kenoyer requested a driver's license and vehicle registration and Anderson produced both immediately. Kenoyer asked Anderson to seat himself in the patrol car and Kenoyer proceeded to issue Anderson a warning ticket for equipment violations. As Kenoyer wrote the ticket, he detected a strong odor of alcohol. Anderson admitted at that time that he drank the night before. Kenoyer asked Anderson to take a series of four physical sobriety tests in order to determine the state of Anderson's physical and mental dexterity. Anderson passed by (1) correctly reciting the alphabet, (2) correctly counting from one to ten and back from ten to one, (3) performing the Rhomberg balancing test, and (4) walking heel to toe. Upon Anderson's satisfactory completion of the physical sobriety tests, Kenoyer asked him to get back into the patrol car and take a preliminary breath test with portable breath testing equipment (PBT).

Dr. Joel Padmore is the State Chemist and Director of the South Dakota State Chemical Laboratory. His agency has provided blood alcohol analyses for law enforcement agencies since 1951 and has provided technical support and training for breath testing devices since the late 1960's and early 1970's. In 1979, the State Chemistry Lab assumed responsibility for supervision and maintenance of all evidentiary breath testing devices and received legislative approval for that function as of July 1, 1980. Under its statutory responsibilities, the State Chemistry Lab evaluated portable breath testing devices for the South Dakota Department of Public Safety in the spring of 1981. In a deposition taken for this case by Anderson's attorney, Dr. Padmore explained the PBT.

Preliminary breath testing is accomplished through the use of portable devices that, according to Dr. Padmore, are as accurate statistically as intoxilyzers, the results of which are currently used in this state as evidence to show blood alcohol levels in excess of .10 and violations of SDCL 32–23–1. Both machines measure breath alcohol content in grams per hundred cubic centimeters on an equivalent blood alcohol analysis, commonly called weight percent. The intoxilyzers and the PBTs used in South Dakota are both accurate to within two to three percent, which means that the variance when measuring a test standard of .10 is between .098 and .12. Dr. Padmore tested the PBTs under simulated field conditions and found them no more susceptible to error than intoxilyzers operated in fixed positions, given equally competent test administration. Both devices, if operated improperly, can indicate a lower breath alcohol content than is actually present, but neither can indicate a level greater than is actually present. The results of the preliminary breath test that Kenoyer administered to Anderson indicated that his blood alcohol content was greater than .10. Anderson later submitted to Kenoyer's request for a blood test and the results indicated that Anderson's blood alcohol content was .25 percent.

Anderson apparently contends that under SDCL 32–23–10 a PBT cannot be given prior to arrest. The statute reads in part:

> Any person who operates any vehicle in this state is considered to have given his consent to a chemical analysis of his ... breath ... to determine the amount of alcohol in his blood ... provided the test is administered at the direction of a law enforcement officer having lawfully arrested the person for a violation of SDCL 22–23–1.

Under Anderson's theory, a law enforcement officer would have to subjectively determine from relevant facts and circumstances that probable cause for arrest ex-

isted under SDCL 32–23–1, the DWI statute, before a PBT could be administered.

■ A lawful arrest requires that the arresting officer have either an arrest warrant or "reasonable" or "probable" cause to believe the person arrested had committed or was committing a crime. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). This court examined the requirements for probable cause for arrest in *State v. Glick,* 87 S.D. 1, 201 N.W.2d 867 (1972), and stated that:

> "To establish 'probable cause' proof beyond a reasonable doubt is not required. 'On the other hand, good faith on the part of the arresting officers is not enough. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed * * * suspicion is not enough'."

87 S.D. at 5–6, 201 N.W.2d at 869, *citing Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134.

■ In *State v. Moves Camp,* 286 N.W.2d 333 (S.D.1979), this court stated that a police bulletin, or a tip such as the Wall Police Chief's call to Kenoyer, may constitute probable cause when independent factors, outside the police bulletin or tip, also provide a basis for probable cause. *Id.* Kenoyer testified that he did not observe Anderson violate any traffic laws prior to the time that he stopped the Scout and that Anderson passed the four physical sobriety tests he administered and that Anderson did not exhibit physical manifestations of being under the influence of alcohol prior to administration of the PBT. By Kenoyer's admission, the PBT was administered on the basis of the Wall Police Department tip, which, under this court's standard for probable cause for arrest, is not sufficient on its own, *see Moves Camp, supra.* However, the odor of alcohol about Anderson and Anderson's admission that he had consumed alcohol the night before are additional facts which, in this case, constitute probable cause.

The State contends that SDCL 32–23–10, the implied consent law, refers only to

tests, the results of which may be admitted as evidence to show alcohol content in relation to SDCL 32–23–7, the presumptive level for conviction under SDCL 32–23–1. This argument is based on the State's assertion that PBT results are not used as evidence of an alcohol content above or below .10, the presumptive level, but are only used as a pre-arrest sobriety test to establish probable cause for arrest and the administration of evidentiary tests, i.e., the blood test or the intoxilyzer.

■ The issue is whether preliminary breath alcohol tests, facilitated by portable breath testing devices, may be given on the scene before probable cause for arrest becomes apparent. We believe that SDCL 32–23–10, which permits chemical analysis of a defendant's blood, breath or other bodily substance after a lawful arrest has been made, must be read in pari materia with the rest of the chapter. SDCL 32–23–10 specifically states that a chemical analysis may be done "to determine the amount of alcohol in his blood as provided in § 32–23–7 ...." SDCL 32–23–7 involves the statutory presumptions attached to different levels of blood or breath alcohol as determined by the chemical analysis permitted under SDCL 32–23–10. Blood and breath test results may indicate a per se violation of SDCL 32–23–1(1) and can be conclusive evidence to show a violation of SDCL 32–23–1(2). Refusal to submit to the chemical analysis permitted under SDCL 32–23–10, the implied consent statute, may result in driver's license revocation. Consequently, the legislature's limitation of evidentiary chemical analysis to arrest situations is appropriate.

■ Anderson was not under arrest in this case and chemical analysis of his breath cannot be justified under the implied consent law. His license could not have been revoked had he refused to take the PBT and the statutory presumptions provided by SDCL 32–23–1(1) and SDCL 32–23–7 cannot attach to the test results.

SDCL 32–23–1.2 states, however, that:

Every person operating a motor vehicle which ... is operated in violation of any of the provisions of this chapter shall, at the request of a law enforcement officer, submit to a breath test to be administered by such officer. If such test indicates that such operator has consumed alcohol, the law enforcement officer may require such operator to submit to a chemical test in the manner set forth in this chapter.

This statute permits a preliminary breath test prior to arrest when a person operates a vehicle in violation of any provision contained in SDCL ch. 32–23.

Anderson contends that law enforcement officers who administer the PBT test must have probable cause to arrest a suspect for violation of a provision of SDCL ch. 32–23 prior to administration of that test under SDCL 32–23–1.2. We disagree.

 The legislature would not have gone to the trouble of passing SDCL 32–23–1.2 if they did not intend it to go beyond the restrictions incorporated in SDCL 32–23–10. Probable cause for arrest is not required for administration of the PBT under SDCL 32–23–1.2. A reasonable suspicion on the part of a law enforcement officer that a person is operating a motor vehicle in violation of any of the provisions of SDCL ch. 32–23 is sufficient justification for administration of a PBT.

 PBT results may not be used as evidence against a defendant. The statute specifically provides that: "If such test indicates that such operator has consumed alcohol, the law enforcement officer may require such operator to submit to a chemical test in the manner set forth in this chapter." SDCL 32–23–1.2. The results of the second test may be used as evidence "in the manner set forth" in SDCL ch. 32–23, which includes the statutory presumptions. Refusal to submit to a PBT does not warrant revocation of license; however, refusal to submit to chemical analysis after probable cause is demonstrated through the PBT does warrant license revocation. The PBT results may be admitted as evidence only when a defendant raises the issue of probable cause and questions the grounds for the arrest.

 We believe that SDCL 32–23–1.2 permits implementation of the PBT as a field sobriety test, which, like the traditional mental and physical dexterity tests, may be given upon reasonable suspicion that a person has violated SDCL 32–23–1. An officer's reasonable suspicion that a driver is under the influence of alcohol may include (1) a subjective opinion based on observation and perception,* (2) observation of improper driving, (3) a tip from a reliable source, or (4) an admission of alcohol consumption. In this case, the Wall Police Chief's tip, the odor of alcohol about Anderson, and Anderson's admission that he had consumed alcoholic beverages the night before he was stopped, justified Kenoyer's reasonable suspicion that Anderson was driving while under the influence.

We reverse the trial court's order and remand for further proceedings.

FOSHEIM, C.J., WOLLMAN, J., and WUEST, Acting Justice, concur.

HENDERSON, J., concurs in result.

HENDERSON, Justice (concurring in result).

Although I concur in the result of this case, I cannot accept that the police tip (based on hearsay) would, in itself, constitute articulable suspicion to stop the car of appellant. An equipment violation would justify stopping the car. Here, there was an equipment violation. But, under the language of this opinion, a hearsay tip opens the door for any officer to now stop someone on the highway for no reason at all other than a hearsay tip. It is bad enough that we have cars being stopped, at random, all over South Dakota at this time for "traffic checks" (I refer not to roadside truck weigh-in stations), driver's license checks, and equipment safety checks. This

---

* The odor of alcohol, slurred speech, loss of balance or dexterity or any of a number of other observable factors may be the basis for a subjective opinion.

is being done, from one end of the state to the other, with the officers full well knowing that it is unconstitutional per *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and that the vehicle safety law of this state has been repealed.[1] The citizens of this state have a right to drive upon the highways without being harassed;[2] if there is a violation, such as an obvious equipment violation, or a moving violation, that is a horse of a different color. Ostensibly, we are supposed to live in a free country. This includes traveling down a highway. In *Delaware v. Prouse, id.*, the United States Supreme Court prohibited "at random" stops. Stops can be made upon the highway, by law enforcement, but they must have a reason therefore. In *State v. Anderson*, 331 N.W.2d 568 (S.D.1983), we held that it had to be an articulable suspicion. I would not extend this to a hearsay tip standing by itself. There is evidence here of alcohol on the breath, an admission of drinking the night before, a taillight violation, and a crossing of a driving line. A hearsay tip might well have triggered following appellant's car. But the equipment violation and going across the white line justified the stop. Once the stop took place, the officer could smell alcohol on appellant's breath.

We cannot live, as citizens, in total fear of going out onto the highway and being stopped for no reason at all. If the citizenry can be stopped by armed officers in police vehicles with lights flashing, and forced to pull over onto the shoulder at the officers' unbridled discretion, we no longer are a free people. As citizens, we should not have to tolerate a safety inspection of our vehicle when the annual mandatory

safety inspection law of this state was repealed in 1979. *See* 1979 S.D.Sess.Laws ch. 220.[3] In this case, because of the factual scenario, law enforcement has not run amok, but the language of this opinion will permit law enforcement to take another step forward in eliminating the freedom that the public are supposed to enjoy as citizens of this Republic. For, as I pointed out in *State v. Anderson*, 331 N.W.2d at 573 (Henderson, J., concurring in result):

> Erosions of liberty do not come in giant leaps, they come in miniscule encroachments often hidden to the trained and educated mind. Like a thief in the night, language can steal a liberty deeply ingrained in the fabric of the American way of life. I am afraid of each little encroachment on the liberty of my fellow Americans on the highway.

"As *Terry v. Ohio*, [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)], recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972)." *Delaware*, 99 S.Ct. at 1401.

In my Sequel in *State v. Maves*, 358 N.W.2d 805, 812 (S.D.1984) (Henderson, J., dissenting), my last words were: "In the land of the free, where has freedom gone?" One of the places that it has been lost, as the narrative suggested, was in print in the courts of our land. Travel and privacy on the public roadways interfered with at the unbridled discretion of police

1. The essential purpose of proscription in the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard privacy and security of individuals against arbitrary invasion. *Delaware*, 99 S.Ct. at 1392.

2. Marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure, limited in magnitude compared to other intrusions but

nonetheless constitutionally cognizable, at the unbridled discretion of law-enforcement officials. U.S.C.A. Const. Amends. 4, 14. *Delaware*, 99 S.Ct. at 1392.

3. I am not suggesting that laws do not exist in this state requiring safe motor vehicles, *see* SDCL 32–21–27. However, before stopping a vehicle for an unsafe mechanical condition, or an equipment violation, the officer must have evidence *before* he stops the motor vehicle. *See* SDCL 32–21–28.

officers or not, what shall it be in South Dakota? The United States Constitution was not only visionary but it was realistic for it provided for the separation of powers among the branches of government, establishing a system of checks and balances and an independent Judicial system to restrain any excesses of government. Language contained in this opinion can lead, if it does not invite, to an excess of government by the executive branch. Therefore, in fearing that the European Culture from whence our forefathers fled be imprinted on the South Dakota prairie, I can only join in the result of this opinion.